**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTONIA CORNELIUS THOMAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-625-CWB** |
| | ) | |
| **FRANK BISIGNANO,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**I.      Introduction and Administrative Proceedings**

Antonia Cornelius Thomas ("Plaintiff") filed an application for Supplemental Security Income under Title XVI of the Social Security Act on September 8, 2021 and an application for Disability Insurance Benefits under Title II of the Social Security Act on October 14, 2021— initially alleging disability onset as of December 31, 2020 but later amending to August 31, 2021— due to high blood pressure, aortic dissection, and open heart surgery.  (Tr. 25, 65, 88-90).[1] Plaintiff's claims were denied at the initial level on July 19, 2022 and again after reconsideration on August 17, 2023.  (Tr. 25, 88-89, 95, 104-05, 116, 121, 126, 131, 137, 141, 145, 149).  Plaintiff then requested *de novo* review by an administrative law judge ("ALJ").  (Tr. 25, 152).  The ALJ subsequently heard the case on March 12, 2024 (Tr. 25, 47-80), at which time testimony was given by Plaintiff (Tr. 54-72) and by a vocational expert (Tr. 72-78).  The ALJ took the matter under advisement and issued a written decision on August 5, 2024 that found Plaintiff not disabled. (Tr. 25-40).

---

[1]  References to pages in the transcript are denoted by the abbreviation "Tr."

The ALJ's written decision contained the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since August 31, 2021, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: aortic aneurysm, hypertension, depression, and status post-tubular artery valve replacement (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant could occasionally lift and carry up to ten pounds, and frequently lift and carry less than ten pounds. The claimant could sit for six hours out of an eight-hour day, could stand for two hours out of an eight-hour day, and could walk for two hours out of an eight-hour day. The claimant could occasionally use foot controls and could occasionally climb ramps and stairs. The claimant could never climb ladders, ropes, or scaffolds. The claimant could occasionally stoop, kneel, crouch, and crawl. The claimant should never work around unprotected heights. The claimant could occasionally be expos[ed] to extreme cold or extreme heat. The claimant could occasionally tolerate vibrations. The claimant would be limited to simple one- or two-step tasks and would be able to perform simple work-related decision making involving the use of judgement. The claimant could occasionally interact with coworkers, supervisors, and the general public. The claimant could adapt to few gradually introduced workplace changes.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 28, 1984, and was 37 years old, which is defined as a younger individual age 18-44, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

2

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 27, 28, 29, 31, 38, 39). On June 4, 2025, the Appeals Council denied Plaintiff's request for review (Tr. 1-5), thereby rendering the ALJ's decision the final decision of the Commissioner. *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Plaintiff now asks the court to reverse the final decision and remand the case for a new hearing and further consideration. (Doc. 11 at p. 13). As contemplated by 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the exercise of full jurisdiction by a United States Magistrate Judge (Doc. 15), and the court finds the case ripe for review pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3) in that the court construes Plaintiff's supporting brief (Doc. 11) as a motion for summary judgment and the Commissioner's opposition brief (Doc. 16) as a competing motion for summary judgment. Upon consideration of the parties' submissions, the relevant law, and the record as a whole, the court concludes that Plaintiff's motion for summary judgment is due to be denied, that the Commissioner's motion for summary judgment is due to be granted, and that the final decision is due to be affirmed.

## II.     Standard of Review and Regulatory Framework

The court's review of the Commissioner's decision is a limited one. Assuming the proper legal standards were applied by the ALJ, the court is required to treat the ALJ's findings of fact as conclusive so long as they are supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v.*

3

*Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla," but less than a preponderance, "and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence.") (citations omitted). The court thus may reverse the ALJ's decision only if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied. *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). Reversal is not warranted simply because the court itself would have reached a contrary result. *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991). Despite the deferential nature of its review, however, the court must look beyond those parts of the record that support the decision, must view the record in its entirety, and must take account of evidence that detracts from the evidence relied on in the decision. *See Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *see also Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

To qualify for disability benefits and establish entitlement for a period of disability, a person must be unable to:

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[2] To make such a determination, the ALJ employs a five-step sequential evaluation process:

---

[2]   A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3).

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of Impairments]?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3] *See also* 20 C.F.R. §§ 404.1520 & 416.920.

The burden of proof rests on the claimant through step four. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). A claimant establishes a *prima facie* case of a qualifying disability once he or she has carried the burden of proof from step one through step four. *Id*. At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform. *Id*.

In order to assess the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Phillips*, 357 F.3d at 1238-39. The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence. *Id*. It may contain both exertional and nonexertional limitations. *Id*. at 1242-

---

[3] Because the same sequence applies in both, cases arising under Title XVI are appropriately cited as authority in Title II cases, and vice versa. *See, e.g., Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 876 n.* (11th Cir. 2012) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy that the claimant can perform. *Id*. at 1239.  To do so, the ALJ can use either the Medical Vocational Guidelines ("grids"), *see* 20 C.F.R. pt. 404 subpt. P, app. 2, or call a vocational expert ("VE").  *Id*. at 1239-40.  The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual, and combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*. at 1240.

### III.    Issue on Appeal

Plaintiff raises one issue on appeal: whether the ALJ erred by not recontacting the cardiovascular examiner.  (Doc. 11 at p. 2).

### IV.    Discussion

Plaintiff asserts that the ALJ erred in failing to recontact cardiovascular consultative examiner Ivan Slavich, M.D.  (Doc. 11 at p. 12).  Specifically, Plaintiff asserts that recontacting Dr. Slavich was necessary for the ALJ to make an informed decision based upon Dr. Slavich's findings and suggestion for an echocardiogram to determine the extent of Plaintiff's residual aortic insufficiency.  (*Id*.; Tr. 37, 807).  Plaintiff argues that because of this noted abnormality and the need for additional testing, the medical evidence of record presents a gap/incompleteness pertaining to his heart impairments such that the ALJ's failure to recontact Dr. Slavich rendered the record inadequate for the ALJ to properly determine the nature and extent of his heart related impairments—both as to whether the impairments meet or equal the relevant cardiovascular listings and as to RFC.  (*Id*. at pp. 12-13).  The Commissioner contends that the ALJ did not need to recontact Dr. Slavich, as his report was neither inadequate nor incomplete and the record

6

contained sufficient evidence to determine that Plaintiff was not disabled.  (Doc. 16 at p. 8).

"Social Security proceedings are inquisitorial rather than adversarial," and "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record."  *Graham*, 129 F.3d at 1422.  "This obligation requires the ALJ to develop the claimant's complete medical history for at least the 12 months preceding the month in which the application was filed, assist the Claimant in obtaining evidence from his or her treating sources, and order a consultative examination when such an examination is necessary to make an informed decision."  *Rivera Perez v. Comm'r of Soc. Sec.*, No. 6:20-CV-79, 2021 WL 289052, *2 (M.D. Fla. Jan. 28, 2021); 20 C.F.R. §§ 404.1512(b)(1)-(2), 416.912(b)(1)-(2).

The ALJ's obligation to develop the record "exists even if the claimant is represented by counsel or has waived the right to representation."  *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).  However, "[t]here must be a showing that the ALJ's failure to develop the record led to evidentiary gaps in the record, which resulted in unfairness or clear prejudice, before the court will remand a case for further development of the record."  *Rodriguez-Torres v. Saul*, No. 8:18-CV-1982, 2019 WL 4267955, *4 (M.D. Fla. Sept. 10, 2019), *aff'd sub nom. Torres v. Comm'r of Soc. Sec.*, 819 F. App'x 886 (11th Cir. 2020).  "At a minimum, clear prejudice 'requires a showing that the ALJ did not have all of the relevant evidence before him in the record ... or that the ALJ did not consider all of the evidence in the record in reaching his decision.'"  *Rivera Perez*, 2021 WL 289052 at *3 (quoting *Kelly v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985)); *Thomas-Joseph v. Comm'r of Soc. Sec.*, No. 21-11020, 2022 WL 1769134, *2 (11th Cir. June 1, 2022).

In situations where the evidence is incomplete or inconsistent, the Commissioner will consider evidence to be insufficient if it does not contain all the information the Commissioner needs to make his determination or decision, such as when the evidence "conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. §§ 404.1520b(b), 416.920b(b).  According to the regulations:

> If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency.  The action(s) we take will depend on the nature of the inconsistency or insufficiency ... . (i) We may recontact your medical source. ...[4]

20 C.F.R. §§ 404.1520b(b)(2)(i), 416.920b(b)(2)(i).

The regulations also provide that an ALJ may require a claimant to undergo a consultive examination if the record evidence is otherwise inadequate to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1519a(b), 416.919a(b).[5]  The Commissioner will consider the following factors in reviewing the report:

> (1) Whether the report provides evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses;
>
> (2) Whether the report is internally consistent; Whether all the diseases, impairments and complaints described in the history are adequately assessed and reported in the clinical findings; Whether the conclusions correlate the findings from your medical history, clinical examination and laboratory tests and explain all abnormalities;

---

[4] "Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law ... ."  20 C.F.R. §§ 404.1502(d), 416.902(d).

[5] The Commissioner will purchase a consultative examination only from a qualified medical source.  20 C.F.R. §§ 404.1519g(a), 416.919g(a).  "Qualified" means that the medical source must be currently licensed in the State and have the training and experience to perform the type of examination or test the Commissioner will request.  20 C.F.R. §§ 404.1519g(b), 416.919g(b).

(3) Whether the report is consistent with the other information available to us within the specialty of the examination requested; Whether the report fails to mention an important or relevant complaint within that specialty that is noted in other evidence in the file (e.g., your blindness in one eye, amputations, pain, alcoholism, depression);

(4) Whether this is an adequate report of examination as compared to standards set out in the course of a medical education; and

(5) Whether the report is properly signed.

20 C.F.R. §§ 404.1519p(a)(1)-(5), 416.919p(a)(1)-(5).  If the consultative report is inadequate or incomplete, the Commissioner will contact the medical source and ask the medical source to furnish the missing information or prepare a revised report.  20 C.F.R. §§ 404.1519p(b), 416.919p(b).  An incomplete report is one that lacks: (1) the claimant's major or chief complaints; (2) a detailed description of the history of the claimant's major complaints; (3) a description, and disposition, of pertinent "positive" and "negative" detailed findings based on the history, examination and laboratory tests related to the major complaints, and any other abnormalities or lack thereof reported or found during examination or laboratory testing; (4) the results of laboratory and other tests (e.g., X-rays) performed; (5) a diagnosis and prognosis for the claimant's impairments; or (7) an "explanation or comment on" the claimant's major complaints and any other abnormalities found during the history and examination or reported from the laboratory tests. 20 C.F.R. §§ 404.1519n(c)(1)-(5), (7), 416.919n(c)(1)-(5), (7).

Here, the evidence before the ALJ was sufficient for the ALJ to properly assess Plaintiff's disability claim without needing to recontact Dr. Slavich.  In addition to Plaintiff's testimony, the ALJ also considered function reports, treatment records, medical opinions, and the State agency medical consultants' prior administrative medical findings.  (Tr. 32-37).  The ALJ noted that Plaintiff's Disability and Function Reports provided the following:

On the Disability Report- Adult (SSA-3368), the claimant alleged disability due to hypertension, aortic dissection, and open-heart surgery (Exhibit 1E/2). On the Function Report- Adult (SSA-3373), received January 31, 2022, the claimant alleged that his conditions affect his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, and complete tasks (Exhibit 6E/6).

On the Function Report- Adult- Third Party (SSA-3380), dated March 28, 2023, the claimant's mother, Fannie Thomas ("Ms. Thomas"), alleged that the claimant's conditions affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, and follow instructions (Exhibit 10E/6).

On the Disability Report- Appeal (SSA-3441), the claimant reported that he had been diagnosed with anemia in July of 2022 (Exhibit 8E/2). The claimant also reported that he was receiving mental health treatment for depression through East Alabama Mental Health (Exhibit 8E/2).

\*\*\*

The undersigned has carefully considered the claimant's reported activities of daily living. On the Function Report- Adult, received January 31, 2022, the claimant reported that he lived alone in a mobile home. The claimant wrote that, from the time he awakened until the time he went to bed, he would eat breakfast, then take his first dose of medication. He would do a little exercise if he did not have physical therapy. He would do a little cleaning around the house and take his other medications. He would relax, eat, shower, then go to bed (Exhibit 6E/1-2).

On the Function Report- Adult- Third Party, dated March 28, 2023, Ms. Thomas reported that the claimant lived in a mobile home with his kids. From the time he wakes until he goes to bed, the claimant brushes his teeth, eats, exercises, watches TV, takes medicine, walks a little, and takes a shower. Ms. Thomas wrote that the claimant is up all night because his mind was racing (Exhibit 10E/1-2).

(Tr. 32-33, 327, 362-63, 367, 376, 393-94, 398). The ALJ summarized Plaintiff's testimony as

follows:

Regarding his allegations, the claimant testified that he was diagnosed with an aortic dissection and had surgery on August 31, 2021. Since then, he has experienced numbness in his feet, tightness and chest pain, and mental problems related to his inability to do day to day functions. He cannot work in his yard like he used to, and he has to have his kids help him bring in groceries. The claimant takes three medications for hypertension, as well as medication for depression and anxiety daily. He testified that his anxiety medication gives him the jitters; his doctor told him that this was normal. He has difficulty focusing due to anxiety attacks. He testified that his circulation is poor and blood flow is not bringing

10

oxygen to his heart and brain properly.

\*\*\*

The claimant testified that he gets up with his kids around 6am to get them to school, then he eats and takes his medicine. He tries to drink water and hydrate. If he does not feel good, he will [lie] back down until lunchtime. Then, he takes his midday medicines, eats, and drinks water. He is always sleeping. He tries to handle business on the phone and tries do something around the house. Once the kids get home, he tries to help them with their work, gets ready for the next day, and starts the routine over again.

(Tr. 32, 33).

The ALJ also considered Plaintiff's treatment records in relation to his cardiovascular impairments that showed the following:

Turning to the medical evidence, the claimant presented to the East Alabama Medical Center emergency room on August 31, 2021, having developed chest and back pain following cocaine use. Imaging showed an acute Type B dissection with an ascending intramural hematoma versus a thrombosed type A dissection (Exhibit 1F/106). The claimant underwent transesophageal echocardiography ("TEE") and ascending aortic replacement and was discharged on September 10, 2021 (Exhibit 1F/106). Following his surgery, the claimant developed a right-sided pleural effusion. He underwent thoracentesis on September 20, 2021. On September 24, 2021, the claimant presented to the freestanding emergency department due to shortness of breath and dyspnea on exertion, and a chest x-ray showed a larger pleural effusion, as well as a seroma at his groin cannulation site (Exhibit 1F/6). The claimant was admitted to East Alabama Medical Center. Lab work indicated that the claimant's hemoglobin was 8.0, indicating anemia (Exhibit 1F/39). He underwent a thoracoscopy with pleurodesis on September 27, 2021, and was discharged on September 30, 2021 (Exhibit 1F/35).

The claimant had an initial cardiac appointment with Dr. Peden with Pinnacle Cardiovascular Group on October 19, 2021 (Exhibit 2F/7). He reported that his shortness of breath was better, and that he did not check his blood pressure at home but was compliant with medications. He continued to have "some vague sensation" in his right foot which was nonspecific (Exhibit 2F/7-8). The claimant's blood pressure on examination was 145/84, with no edema, mood and affect appropriate. Dr. Peden started the claimant on losartan, and advised to continue with amlodipine, hydralazine, and labetalol. He was to call if his blood pressure was consistently above 130/80 (Exhibit 2F/7-8). During a follow-up on May 3, 2022, the claimant's blood pressure was 173/102; he reported that his home blood pressures were typically better than this when he has good sleep. His numbers from cardiac rehab suggested this also (Exhibit 9F/2). On November 3, 2022, the claimant's blood

11

pressure was 164/85; he reported that his home blood pressures were 120s over 80s. He stated he was seen at University of Alabama- Birmingham ("UAB") cardiology recently for follow up and given a good report; he was doing well, aside from difficulty with sleeping (Exhibit 9F/4).

The claimant saw Dr. Eudailey, with UAB cardiology, for evaluation of residual Type B aortic dissection on October 25, 2021 (Exhibit 3F/10). A review of symptoms was negative for fatigue, decreased activity, shortness of breath, or peripheral edema, although the claimant did note intermittent leg weakness with significant exertion as well as associated paresthesia (Exhibit 3F/12-13). The claimant underwent thoracic endovascular aortic repair ("TEVAR") with carotid to left subclavian bypass on November 4, 2021. At his follow-up appointment February 22, 2022, the claimant reported that he was doing very well. He was going to cardiac rehab, denied upper back pain, chest pain, or shortness of breath. The leg cramping that he experienced pre-op had resolved completely. His blood pressure was mostly 120-130 systolic. He looked great and was in good spirits (Exhibit 3F/1). The claimant was to return to clinic in six months, continue cardiac rehab and heart-healthy diet, and follow up with his cardiologist and primary care provider (Exhibit 3F/2). The claimant completed all 36 sessions and graduated from cardiac rehab, moving from 3.2 METs to 6.0 METs (Exhibit 6F/5). The claimant's reported physical activities included 20 minutes on an exercise bike and shooting basketball for 30 minutes with his kids (Exhibit 6F/5).
The claimant established care with Mercy Medical Clinic on November 16, 2021 (Exhibit 6F/25). On April 7, 2022, the claimant reported depression; he was given a referral card to East Alabama Mental Health Center ("EAMHC") and prescribed Paxil (Exhibit 6F/23). At his December 21, 2023, appointment, the claimant's blood pressure was 186/90. The claimant stated that he was compliant with his prescriptions most days but misses a dose here and there. He denied any chest pains, shortness of breath, or swelling in his feet. The claimant was encouraged to take his medicine as prescribed, monitor his diet, and exercise as it would help his blood pressure (Exhibit 11F/4).

***

The claimant completed a cardiac questionnaire, dated January 27, 2022 (Exhibit 4E). The claimant had his second heart surgery on November 4, 2021; at the time that this form was completed, the claimant was participating in Cardiac Rehab sessions. The claimant reported chest discomfort with too much strain. The discomfort was relieved by medication and rest. He also reported shortness of breath related to overexertion (Exhibit 4E/1). However, during his follow-up appointment with Dr. Eudailey on February 28, 2022, the claimant reported that he had been doing very well. He denied chest pain, upper back pain, and shortness of breath. The leg cramping that he experienced had resolved; he was to return to clinic in six months.

12

(Tr. 33-34, 37, 349, 471, 500, 504, 571, 639-40, 642-43, 651, 653-54, 706, 724, 726, 778, 780, 800) (footnote omitted).

In considering the prior administrative findings of State agency medical examiners Harold Settle, M.D., and Victoria Hogan, M.D., the ALJ found them partially persuasive. (Tr. 35). The ALJ noted that at the initial level of review, Dr. Settle found that Plaintiff was capable of work at a narrowed level of light exertion and that on reconsideration Dr. Hogan found that Plaintiff was capable of work at the light level of exertion. (Tr. 35, 86, 95, 104, 112). The ALJ explained that because the examiners' findings were based on a one-time review with no direct examination of Plaintiff and did not include consideration of the testimony and supplementary medical records that were received at the hearing level, the ALJ, with the benefit of additional evidence, assigned additional limitations and further reduced Plaintiff to the sedentary level of exertion. (Tr. 35).

The ALJ also considered the June 17, 2023 consultative physical examination conducted by Tina Holloway, a certified nurse practitioner. (Tr. 36). The ALJ noted that chief complaints included hypertension, aortic dissection, open heart surgery, and anemia and that Plaintiff reported that he had been unable to work since his heart surgeries and could not tolerate much physical activity to play with his children, work on his car, or anything because he got winded and tired quickly. (Tr. 36, 762). The ALJ further noted that Plaintiff stated he sometimes had chest pain and continued to have tingling in his feet, that he was independent in activities of daily living such as cooking, personal care, and driving, and that he drove himself to his appointment. (Tr. 36, 762-63). The ALJ observed that Plaintiff's examination reflected that his blood pressure was 160/80 and that there were no abnormal findings noted on his physical examination. (Tr. 36, 763-67). Specifically, the ALJ noted that Plaintiff's range of motion was within normal limits, that he had no difficulty getting on and off the table, that his gait and station were normal, that he was able to

13

walk on heels, toes, squat, and rise with no difficulty, that his strength was 5/5 in all four extremities and left and right grip, and that there was a decreased sensation in Plaintiff's feet. (Tr. 36, 763-67). The ALJ commented that Holloway confirmed the complaints of hypertension, Chronic Type B aortic dissection, and chronic vascular disease—noting that Plaintiff was on current medication for those conditions. (Tr. 36). The ALJ stated that while Holloway did not issue any opinion that could be evaluated in terms of persuasiveness, the findings were considered in reaching the conclusions described in the ALJ's decision. (Tr. 36).

At the conclusion of the March 12, 2024 hearing, the ALJ suggested that a cardiac consultative examination might be needed. (Tr. 79). On May 30, 2024, Plaintiff participated in a cardiovascular consultative examination with Dr. Ivan Slavich. (Tr. 37, 806-16). The ALJ observed that Dr. Slavich's report noted that Plaintiff's chief complaint was "shortness of breath," that Plaintiff had a driver's license and was able to drive, that he carried out his activities of daily living, and that no syncope or near-syncopal symptoms, orthopnea, or paroxysmal nocturnal dyspnea were reported. (Tr. 37, 806). The ALJ noted that on examination Plaintiff's blood pressure was 170/89, that his heart rate and rhythm were regular, that there was a 1-2/6 diastolic murmur of the left sternal border and an S4 gallop, that point of maximal impulse was not displaced, that no edema was noted, that he climbed on the examining table without difficulty, that his gait was normal, that he could walk on heels and toes, that he could squat, that his range of motion was within normal limits, and that he had no motor or sensory deficits. (Tr. 37, 806-07). Dr. Slavich diagnosed Plaintiff as a "New York Heart Classification I." (Tr. 37, 807). The ALJ explained that "[t]he New York Heart Association places patients in one of four categories based on limitations of physical activity. Class I indicates no limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, or shortness of

14

breath." (Tr. 37 n.2).[6]  The ALJ noted that Dr. Slavich ultimately diagnosed Plaintiff with status

post repair of aortic dissection, hypertension that did not appear to be optimally controlled, aortic

insufficiency murmur of uncertain severity, and history of illicit drug abuse with cocaine and

marijuana. (Tr. 37, 807).  With respect to the diagnosis of aortic insufficiency murmur of uncertain

severity, the ALJ noted that Dr. Slavich suggested an "echocardiogram to follow that up." (Tr. 37,

807).  The ALJ further noted that Dr. Slavich also completed a Medical Source Statement,

indicating that Plaintiff would essentially be capable of medium work and could frequently

perform postural activities. (Tr. 37, 810, 813).  The ALJ found Dr. Slavich's opinion to be partially

persuasive, stating that for at least the period of time under consideration, Plaintiff would have

been limited to no greater than sedentary work.  (Tr. 37).  The ALJ explained that in an effort

to interpret the medical evidence in a light most favorable to Plaintiff, the ALJ also included

additional limitations in the RFC.  (Tr. 37).

> The ALJ then determined that the record as a whole did not support Plaintiff's allegations:
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the treatment notes do not show the serious symptoms and dysfunction that would be expected were the claimant as limited as alleged.
>
> The claimant's history of open-heart surgeries supports a reduction to a sedentary level in the RFC. Because the claimant had decreased sensation in his feet, the undersigned has limited him to only occasional use of foot controls, occasional exposure to extreme heat or cold, never climbing ramps, ladders, and scaffolds, and never working around unprotected heights. His history of aortic dissection and repair supports avoidance of vibration. The claimant's depressive disorder was taken into consideration in limiting the claimant to simple one-to two-step tasks, simple work-related decision making, few gradually introduced changes, and occasional interaction with supervisors, coworkers, and the general public.

---

[6]  See https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure.org (last viewed April 7, 2026).

15

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the objective medical evidence, treatment records, impartial consultative examinations, and hearing testimony.

(Tr. 38).

The record reflects that the ALJ had sufficient evidence to assess Plaintiff's claim for disability and to fashion Plaintiff's RFC, *i.e.*, the medical treatment records, the prior administrative findings, the examination by CNP Holloway, and the consultative examination and opinion of Dr. Slavich.  Plaintiff has failed to show that the record contains any evidentiary gaps that resulted in unfairness or clear prejudice requiring the ALJ to recontact Dr. Slavich. Dr. Slavich's findings were consistent with Plaintiff's treatment records.  Dr. Slavich diagnosed Plaintiff as a "New York Heart Classification I," which "indicates no limitation of physical activity."  (Tr. 37, 807).  Plaintiff speculates that an echocardiogram could have supported further limitations if Dr. Slavich had been recontacted.  However, "[m]ere speculation that an additional examination might have changed the results is not sufficient to show prejudice." *Boisvert v. Comm'r of Soc. Sec.*, No. 2:21-CV-35, 2022 WL 4093065, *6 (M.D. Fla. Sept. 7, 2022); *Lyons v. Kijakazi*, No. 22-60539-CIV, 2023 WL 8261261, *4 (S.D. Fla. Feb. 28, 2023) ("But mere speculation is insufficient to warrant remand.  An ALJ may recontact a claimant's treating physician if the ALJ decides that the record evidence is insufficient to determine whether the claimant is disabled.").  Under the Regulations, an ALJ possesses discretion in deciding whether to recontact a medical source. *See* 20 C.F.R. §§ 404.1520b(b)(2), 416.920b(b)(2) (stating that the Commissioner "*may* recontact [a] medical source," among other alternative measures, to "try to resolve [any] inconsistency or insufficiency" in the evidence) (emphasis added).  "Moreover, while an ALJ has the discretion to recontact a medical source, request additional existing records, or ask for more information, he is not required to develop the record further when the existing

16

record provides support for the RFC determination." *Daniel R. v. Comm'r, Soc. Sec. Admin.*, No. 4:20-CV-160, 2022 WL 16707088, *6 (N.D. Ga. Jan. 18, 2022) (emphasis added) (citing 20 C.F.R. § 404.1512(b) and *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010)).

Here, the ALJ considered the whole record and offered a thorough discussion of the medical evidence in evaluating Plaintiff's disability claim. The ALJ had sufficient information to make an informed decision and was not obligated to recontact Dr. Slavich for additional evidence. In fact, when considering the entire medical record, the ALJ provided further limitations than Dr. Slavich determined. Because the ALJ had sufficient evidence to assess Plaintiff's claims and determine his RFC, and because Plaintiff failed to show that there were any evidentiary gaps in the record resulting in unfairness or clear prejudice, the court finds that the ALJ's disability determination was supported by substantial evidence. *Alvarado v. Colvin*, No. 15-62283-CIV, 2016 WL 3551482, *13 (S.D. Fla. June 30, 2016) ("Because the totality of the medical evidence was sufficient for the ALJ to make her conclusion, the ALJ was not required to recontact [the medical source].").

## V.    Conclusion

After carefully and independently reviewing the record, and for the reasons stated above, the court concludes as follows:

- that Plaintiff's construed motion for summary judgment (Doc. 11) is due to be **DENIED**;

- that the Commissioner's construed motion for summary judgment (Doc. 16) is due to be **GRANTED**; and

- that the Commissioner's decision is due to be **AFFIRMED**.

A separate judgment will issue.

**DONE** this the 16th day of April 2026.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**